UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

RECEIVED

SEP -- 1 200

LARRY W. PROPES, CLERK
CHARLESTON, SC

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | Criminal No.: 9:05-928 |
| v. | ) ) | |
| LEE A. ROBBINS, | ) ) ) ) ) ) ) ) | 18 U.S.C. § 371 (Conspiracy) 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) 18 U.S.C. § 982 (Asset Forfeiture) |
| Defendant. | ) ) | UNDER SEAL |

# INDICTMENT

**THE GRAND JURY CHARGES:**

## COUNT 1
### (Conspiracy, 18 U.S.C. § 371)

### BACKGROUND

1.      Medical Manager Corporation was formed in July 1996, with its primary business the sales, marketing, and development of computer software to assist physicians and other health care providers manage their health care practices.  In or about February 1997, Medical Manager Corporation conducted an initial public offering of its shares.  Its shares began to be publicly traded under the ticker symbol MMGR on the National Association of Securities Dealers Automatic Quotation National Market System (NASDAQ), a national securities exchange.

2.      In or about July 1999, Medical Manager Corporation was acquired by, and became a wholly owned subsidiary of, Synetic, Inc. (Synetic).   Synetic assumed the corporate name of Medical Manager Corporation and changed the name of the former Medical Manager Corporation to Medical Manager Health Systems, Inc.  The common stock of the new Medical Manager Corporation continued to be  traded on the NASDAQ under the ticker symbol MMGR.  Medical Manager Corporation and its wholly owned subsidiary, Medical Manager Health Systems, Inc., are referred to herein collectively as "Medical Manager."

3.      In or about September 2000, Medical Manager was acquired by, and became a wholly owned subsidiary of, Healtheon WebMD Corporation.  After the acquisition, Healtheon WebMD changed its name to WebMD Corporation (WebMD).  WebMD's stock was publicly traded on the NASDAQ under the symbol HLTH.

4.      Medical Manager conducted its operations primarily through a number of wholly-owned subsidiaries. One of the subsidiaries,  Medical Manager R&D (MMR&D), engaged in

2

research and development activities; another subsidiary, Medical Manager Sales and Marketing

(MMS&M) coordinated national sales and marketing activities. The remaining six subsidiaries

provided direct sales, marketing and support of "The Medical Manager," the company's primary

software product, to customers in the company's six geographic regions, which consisted of

Medical Manager Northeast (MMNE), Medical Manager Southeast (MMSE), Medical Manager

Midwest (MMMW), Medical Manager Southwest (MMSW), Medical Manager West (MMW)

and Medical Manager Northwest (MMNW).

**A.**    **Defendant**

5.    Defendant **LEE A. ROBBINS (ROBBINS)** was Vice President and Chief

Financial Officer of Medical Manager from 1996 until September 2000. He received a B.S. in

Accounting from the University of Cincinnati and a Masters of Business Administration from

Xavier University.

**B.**    **Regulation of Securities**

6.    The United States Securities and Exchange Commission (the SEC), headquartered

in Washington, D.C., was an agency responsible for enforcing federal securities laws. SEC

regulations protected members of the investing public by, among other things, requiring that a

company's financial information was accurately recorded and disclosed to the public.

7.    In order to sell securities to the public and to permit public trading of its securities,

Medical Manager was required to register its securities with the SEC. Medical Manager was also

required to comply with laws and SEC regulations designed to ensure that a company's financial

information was accurately recorded and fairly disclosed to the investing public. Medical

Manager was further required to make and keep books and records that accurately reflected its

3

financial condition.

8.      Medical Manager was required to and did file various periodic reports and other documents with the SEC, which included representations concerning its revenues, net income and losses, earnings, the value of its assets and the amount of its liabilities.

9.      These financial statements were required to accurately and fairly reflect the company's financial condition in accordance with Generally Accepted Accounting Principles (GAAP). Medical Manager represented in those filings that their financial statements were in fact prepared in accordance with GAAP.

10.     After Medical Manager merged with Healtheon WebMD Corporation and became WebMD Corporation (WebMD) in September 2000, Medical Manager financial information was incorporated as part of the WebMD periodic filings with the SEC and made available to the investing public.

**C.      Communications with Investors**

11.     In addition to reporting its quarterly financial results to the SEC, the management of Medical Manager held quarterly conference calls with analysts in the securities industry to report its quarterly financial results. Medical Manager also made estimates and projections of their future quarterly financial results. These earnings estimates and the analyst expectations as a result of these conferences, were relied upon by the investing public.

**D.      Medical Manager Acquisition Strategy**

12.     In connection with its initial public offering in 1997, Medical Manager disclosed to the public that it would pursue a strategy of acquiring independent dealers who sold their products as well as dealers who sold competing health care practice management software.

4

Between April 1997 and September 2002, Medical Manager acquired approximately 135 such companies, including dealers owned by a corporation in South Carolina, which they then consolidated with existing subsidiaries. In many of these cases, Medical Manager paid at least a part of the purchase price in Medical Manager stock.

## THE CONSPIRACY

13.    Beginning in or about July 1996, and continuing through at least July 2001, in the District of South Carolina, and elsewhere, defendant **ROBBINS** and others, both known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit the following offenses against the United States:

(a)    to devise a scheme and artifice to defraud holders of Medical Manager securities, and securities of its parent, WebMD, and other members of the investing public and to obtain money from those securities holders, members of the investing public and others by means of materially false pretenses, representations, and promises, and to utilize the United States mails, private and commercial interstate carriers, and interstate wire communications for the purpose of executing that scheme and artifice, in violation of Title 18, United States Code, Sections 1341 and 1343; and

(b)    by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, knowingly and willfully to use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5") in connection with the purchase and sale of Medical

5

Manager securities and subsequently the securities of its parent, WebMD, by, in

connection with such transactions, (i) employing devices, schemes, and artifices to

defraud holders of Medical Manager and WebMD securities and other members

of the investing public and others; (ii) making untrue statements of material facts

and omitting to state material facts necessary in order to make the statements

made, in the light of the circumstances under which they which they were made,

not misleading; and (iii) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit on holders of Medical Manager

and WebMD securities and other members of the investing public, in violation of

Title 15, United States Code, Sections 78j(b) and 78ff(a) and Rule 10b-5.

## THE  PURPOSES OF THE CONSPIRACY

14.    The principal purposes of the conspiracy were:

(a)    to inflate the earnings of Medical Manager in order to meet analyst expectations,

increase market price and prevent a drop in the market price of Medical Manager stock and the

stock of its  parent WebMD;

(b)    to use the artificially increased price of Medical Manager stock to facilitate the

acquisition of companies by Medical Manager which in turn enabled further fraudulent inflation

of Medical Manager's earnings; and

(c)  to personally enrich the defendant and others through various means including, but

not limited to: salary, bonuses, Medical Manager and WebMD stock options, and capital

appreciation of their Medical Manager and WebMD shares.

6

## THE MANNER AND MEANS OF THE CONSPIRACY

15.    The manner and means by which the defendant and his co-conspirators effectuated the purposes of the conspiracy included, but were not limited to the following:

### Deferred Revenue Fraud

16.    Revenue from a sale of a company's product is properly recognized, or included in a company's earnings, when the sale of the product is substantially completed.  If a sale of a product has not been substantially completed it is considered to be work in process, and any funds received or expected to be received from the  purchaser are classified as deferred revenue. Deferred revenue is not included in the company's earnings.  Once the sale is substantially completed, the deferred revenue associated with that sale is classified as revenue and included in the company's earnings.

17.    When Medical Manager acquired another company,  the defendant and his co-conspirators would cause management and accounting personnel at the target company to reclassify as deferred revenue, revenue the target company had already properly recognized, or would cause such entries to be made when they were put on the books of Medical Manager.

18.    Once Medical Manager's acquisition of the target company was completed, the defendant and his co-conspirators would cause Medical Manager to recognize the fraudulently reclassified deferred revenue, as revenue as needed for Medical Manager to meet its revenue and earnings targets and analyst expectations.

19.    In doing so, the defendant and his co-conspirators caused Medical Manager to overstate its reported earnings from 1997 to 2000 inclusive.

7

**Accrued Liabilities Fraud**

20.    A company recognizes expenses, and thus reduces its earnings, at the time the expenses are incurred rather than at the time the expenses are paid.  When a company recognizes an expense, it increases an accrued liability account.  When it actually pays the expense, it decreases the accrued liability account.

21.    To justify putting an accrued liability on a company's books, the liability must be reasonably estimable and reasonably probable.

22.    When Medical Manager acquired a company, the defendant and his co-conspirators would unjustifiably put accrued liabilities on the books of the target company, and transfer only the accrued liability to Medical Manager's books, without an offsetting expense, which created an excess balance, or a "pad," in Medical Manager's accrued liability account.

23.    In order to inflate Medical Manager's earnings in later reporting periods, the defendant and his  co-conspirators would reverse the accrued liability thus fraudulently reducing operating expenses without actually paying any expense.

24.    By reducing operating expenses in this manner, the defendant and his co-conspirators would cause Medical Manager to fraudulently increase its earnings for that reporting period.

25.    In doing so, the defendant and his co-conspirators caused Medical Manager to overstate its earnings from 1997 to 2001 inclusive.

**Allowance for Doubtful Accounts Fraud**

26.    When a company believes it will not collect on accounts receivable, it sets up a bad debt expense.  When a company recognizes a bad debt expense, which reduces earnings, it

8

also sets up an allowance for doubtful accounts.    When a company writes off a specific account receivable it decreases the allowance for doubtful accounts.

27.    When Medical Manager acquired a company, the defendant and his co-conspirators would unjustifiably put an allowance for doubtful accounts on the books of the target company. They would transfer the allowance for doubtful accounts to Medical Manager's books, thus creating an excess balance, or a "pad," in Medical Manager's allowance for doubtful accounts, without an offsetting bad debt expense.

28.    In order to inflate Medical Manager's earnings in later reporting periods, the defendant and his  co-conspirators would reverse the allowance for doubtful accounts, and thus fraudulently reduce its bad debt expenses which fraudulently increased its earnings for that reporting period.

29.    When Medical Manager exceeded their forecasted earnings, the defendant and his co-conspirators would set up a fraudulent allowance for doubtful accounts with the excess earnings, so that they could reverse the allowance for doubtful accounts in later periods when they otherwise failed to meet their earnings forecasts.

30.    By these means, the defendant and his co-conspirators caused Medical Manager to overstate its earnings from 1997 to 2001 inclusive.

## Round Trip Sales Fraud

31.    When Medical Manager acquired other companies, the defendant and his co-conspirators would engage in "round trip" sales with the target company in order to fraudulently inflate Medical Manager's revenue.

9

32.    In order to engage in round trip sales, the defendant and his co-conspirators would first inflate the price Medical Manager paid to acquire a target company.

33.    The defendant and his co-conspirators would then cause the target company to purchase products from Medical Manager in an amount roughly equal to the amount by which they had inflated the purchase price for the target company.

34.    Medical Manager would recognize the revenue from those "sales" and thus increase Medical Manager's earnings in that reporting period.

35.    As a result, the defendant and his co-conspirators fraudulently converted a portion of Medical Manager's investment in a target company to revenue.  As a result, the defendants and their co-conspirators caused Medical Manager to overstate its earnings from 1997 through 1999 inclusive.

### Pooling of Interest Accounting Fraud

36.    If specific requirements were met, a company could account for the acquisition of another company by using the pooling of interest method of accounting.  Under this method of accounting,  the acquiring company could recognize all the revenue earned by the acquired company during the entire quarter of acquisition, not just the revenue earned after the acquisition date.

37.    The defendant and his co-conspirators caused Medical Manager to account for some acquisitions under the "pooling of  interest" method of accounting when the defendants knew the acquisitions failed to qualify for such treatment, thus inflating Medical Manager's reported earnings during the quarter of acquisition.

10

38.    In doing so, the defendant and his co-conspirators caused Medical Manager to overstate its reported earnings from1997 to1999 inclusive.

### Early Recognition of Systems Sales Revenue Fraud

39.    Revenue from a sale of a computer system is properly recognized, or included in a company's earnings, when the system is delivered, installed and usable by the customer.

40.    The defendant and his co-conspirators caused Medical Manager to recognize revenue from the sale of computer systems when they knew that Medical Manager had not completed the delivery and installation of the systems and that they were not sufficiently usable by the customer to recognize the revenue from the sale of the system.

41.    In doing so, the defendant and his co-conspirators fraudulently inflated Medical Manager's reported earnings for such periods.

### Concealment of the Fraud

42.    The defendant and his co-conspirators would conceal from the non-management members of Medical Manager's Board of Directors, Medical Manager's independent auditors, and others that the financial statements reported by Medical Manager were fraudulent.

### Stock Sales at Fraudulently Inflated Prices

43.    The defendant and his co-conspirators would cause the investing public to purchase Medical Manager stock at inflated market prices.

### Benefits to Defendant and His Co-conspirators

44.    The defendant and his co-conspirators would fraudulently induce Medical Manager to pay salaries, bonuses, and stock options, and otherwise provide themselves benefits as a result of the fraudulently inflated financial results.

11

## OVERT ACTS

45.    In furtherance of the conspiracy and to achieve the objects thereof, the defendant and his co-conspirators committed and caused to be committed various acts in the District of South Carolina and elsewhere:

### Filing Fraudulent Financial Statements

46.    On or about the filing dates set forth in paragraphs 47 through 61 below, the defendant and his co-conspirators caused Medical Manager to file with the SEC  materially false financial statements covering the identified periods on the listed SEC forms:

|     | Date of<br>Filing | Form & Period |
| --- | --- | --- |
| 47. | 08/14/97 | Form 10Q for the quarter ending 06/30/97 |
| 48. | 11/06/97 | Form 10Q for the quarter ending 09/30/97 |
| 49. | 03/12/98 | Form 10K for the year ending 12/31/97 |
| 50. | 04/08/98 | Form S-3 for the registration and sale of additional common stock |
| 51. | 05/15/98 | Form 10Q for the quarter ending 03/31/98 |
| 52. | 08/06/98 | Form 10Q for the quarter ending 06/30/98 |
| 53. | 11/13/98 | Form 10Q for the quarter ending 09/30/98 |
| 54. | 03/23/99 | Form 10K for the year ending 12/31/98 |
| 55. | 05/15/99 | Form 10Q for the quarter ending 03/31/99 |
| 56. | 09/28/99 | Form 10K for the year ending 06/30/99 |
| 57. | 11/15/99 | Form 10Q for the quarter ending 09/30/99 |
| 58. | 02/11/00 | Form 10Q for the quarter ending 12/31/99 |

12

| Date of Filing | Form & Period |
|---|---|
| 59. | 05/15/00 | Form 10Q for the quarter ending 03/31/00 |
| 60. | 11/09/00 | Form S-3 for the registration and sale of additional common stock |
| 61. | 11/27/00 | Form 8K for the reporting of significant events including financial statements for the quarter ending 06/30/00 |

### *Companion Technologies Attempted Round Trip Sale*

62.    In or about December of 1997, a co-conspirator spoke by telephone to representatives of Companion Technologies of South Carolina (Companion SC), in Columbia, South Carolina, and requested that, in connection with Medical Manager's proposed acquisition of two subsidiaries of Companion SC, the purchase price for each of the subsidiaries be inflated by $600,000, and that the two subsidiaries use the additional funds to each purchase $600,000 worth of software from Medical Manager.

### *Blue Cross Blue Shield of Arizona Round Trip Sale*

63.    On or about June 25, 1998, defendant **ROBBINS** and others caused Medical Manager to increase the amount it paid to acquire Blue Cross Blue Shield of Arizona (BCBS of Arizona) by approximately $180,400.

64.    On or about June 25, 1998, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" to BCBS of Arizona software licenses for $180,400.

65.    On or about June 30, 1998, defendant **ROBBINS** and others caused Medical Manager to recognize the $180,400 it received back from BCBS of Arizona as revenue in

13

Medical Manager's reported earnings for the quarter ending June 30, 1998.

### *Medical Systems, Inc. Round Trip Sale*

66.    On or about August 17, 1998, the defendant **ROBBINS** and others caused
Medical Manager to increase the amount it paid to acquire Medical Systems, Inc. (Medical
Systems) by approximately $125,000.

67.    On or about August 17, 1998, the defendant **ROBBINS** and others caused
Medical Manager simultaneously to "sell" to Medical Systems certain software licenses for
$125,000.

68.    On or about September 30, 1998, the defendant **ROBBINS** and others caused
Medical Manager to recognize the $125,000 it received back from Medical Systems as revenue
in Medical Manager's reported earnings for the quarter ending September 30, 1998.

### *Medical Systems, Inc. "Deferred Revenue"*

69.    On or about September 30, 1998, defendant **ROBBINS** and others caused
Medical Manager to reclassify $330,740 in previously recognized income on the books of
Medical Systems, as "deferred revenue" when it was put on the books of Medical Manager.

70.    On or about September 30, 1998, defendant **ROBBINS** and others caused
Medical Manager to recognize the $330,740 from "deferred revenue," previously recorded in
connection with the acquisition of Medical Systems, as revenue in Medical Manager's reported
earnings for the quarter ending September 30, 1998.

### *LLBC Enterprises, Inc. Round Trip Sale*

71.    On or about September 21, 1998, the defendant **ROBBINS** and others caused
Medical Manager to increase the amount it paid to acquire LLBC Enterprises, Inc. (LLBC) by

14

approximately $125,000.

72.     On or about September 19, 1998, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" to LLBC  a billing service software license for $125,000.

73.     On or about September 30, 1998, defendant  **ROBBINS** and others caused Medical Manager to recognize the $125,000 it received back from LLBC as revenue in Medical Managers's  reported earnings for the quarter ending September 30, 1998.

### *LLBC Enterprises, Inc. "Deferred Revenue"*

74.     On or about September 30, 1998, defendant **ROBBINS** and others caused Medical Manager to reclassify $182,573 in previously recognized income on the books of LLBC as  "deferred revenue" when it was put on the books of Medical Manager.

75.     On or about September 30, 1998, defendant **ROBBINS** and others caused Medical Manager  to recognize $103,315  from "deferred revenue," previously recorded in connection with the acquisition of LLBC, as revenue in Medical Manager's reported earnings for the quarter ending September 30, 1998.

76.     On or about October 31, 1998, defendant **ROBBINS** and others caused Medical Manager  to recognize an additional $79,258  from "deferred revenue," previously recorded in connection with the acquisition of LLBC, as revenue in Medical Manager's reported earnings for the year ending December 31, 1998.

### *Medical Design and Images, Inc. Round Trip Sale*

77.     On or about September 28, 1998, the  defendant  **ROBBINS** and others caused Medical Manager  to increase the amount it paid to acquire Medical Design and Images, Inc.

15

(Medical Design) by approximately $100,000.

78.     On or about September 29, 1998, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" to Medical Design a billing service software license for $100,000.

79.     On or about October 8, 1998, defendant **ROBBINS** and others caused Medical Manager to recognize the $100,000 it received back from Medical Design as revenue in Medical Managers' reported earnings for the quarter ending December 31, 1998.

### *Lee Data Systems, Inc. "Pooling of Interest"*

80.     On or about October 29, 1998, defendant **ROBBINS** and others caused Medical Manager to acquire Lee Data Systems, Inc. (Lee Data) in exchange for $5,250,000 worth of Medical Manager stock for all the Lee Data stock.

81.     On or about October 29, 1998, defendant **ROBBINS** and others caused Medical Manager to account for the acquisition under the "pooling of interest" method of accounting, which required that stock could be the only consideration exchanged between Medical Manager and the shareholders of Lee Data.

82.     On or about December 31, 1998, defendant **ROBBINS** and others caused Medical Manager, under the "pooling of interest" method of accounting, to recognize all of the revenue previously recognized by Lee Data in the quarter of acquisition, as revenue in Medical Manager's reported earnings for the year ending December 31, 1998.

83.     On or about October 29, 1998, defendant **ROBBINS** and others caused Medical Manager to enter into a separate agreement  or "side letter,"  with the shareholder of Lee Data, promising to pay him $250,000, if Medical Manager did not sell back to him within six months

16

certain real estate acquired as part of the acquisition.

84.     On or about October 6, 1999, defendant **ROBBINS** and others caused Medical Manager to pay the $250,000 and additional amounts to the shareholder of Lee Data for the sale of the real estate acquired as part of the acquisition.

### *Lee Data Systems, Inc. "Deferred Revenue"*

85.     On or about October 29, 1998, defendant **ROBBINS** and others caused Medical Manager to reclassify $145,000 in previously recognized income on the books of Lee Data as "deferred revenue" when it was put on the books of Medical Manager.

86.     On or about December 31, 1998, defendant **ROBBINS** and others caused Medical Manager to recognize $145,000 from "deferred revenue," previously recorded in connection with the acquisition of Lee Data, as revenue in Medical Manager's reported earnings for the year ending December 31, 1998.

### *Lee Data Systems, Inc. "Accrued Liabilities"*

87.     On or about October 29, 1998, defendant **ROBBINS** and others caused Medical Manager to unjustifiably inflate the accrued liabilities account on the books of Lee Data by $30,000 when it was put on the books of Medical Manager.

88.     On or about December 31, 1998, defendant **ROBBINS** and others caused Medical Manager to unjustifiably decrease accrued liabilities relating to the acquisition of Lee Data by $30,000, thereby decreasing operating expenses and increasing Medical Manager's reported earnings for the quarter ending December 31, 1998.

### *ProMed Round Trip Sale*

89.     On or about December 31, 1998, defendant **ROBBINS** and others caused

Medical Manager to increase the amount it paid to acquire ProMed, Inc. (ProMed) by approximately $1,275,000.

90.    On or about December 31, 1998, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" to ProMed 425 software licenses for $1,275,000.

91.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $1,275,000 it received back from ProMed as revenue in Medical Managers's  reported earnings for the quarter ending March 31, 1999.

### *Medical Systems Plus Round Trip Sale*

92.    On or about March 19, 1999,  defendant **ROBBINS** and others caused Medical Manager to increase the amount it paid to acquire Medical Systems Plus by approximately $125,000.

93.    On or about March 19, 1999,  defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" a software license to "Medical Office Management Services, Inc.," an entity related to Medical Systems Plus, for $125,000.

94.    On or about March 31, 1999,  defendant **ROBBINS** and others caused Medical Manager to recognize the $125,000 it received back from Medical Systems Plus as revenue in Medical Manager's reported earnings for the quarter ending March 31, 1999.

### *Western Healthcare, Inc. "Deferred Revenue"*

95.    In or about May of 1999, defendant **ROBBINS** and others caused Medical Manager to reclassify $209,718 in previously recognized income on the books of Western Healthcare, Inc. (Western Healthcare) as  "deferred revenue" when it was put on the books of Medical Manager.

18

96.    On or about June 30, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize $173,624 from "deferred revenue," previously recorded in connection with the acquisition of Western Healthcare, as revenue in Medical Manager's reported earnings for the quarter ending June 30, 1999.

97.    On or about December 31, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize an additional $34,039 from "deferred revenue," previously recorded in connection with the acquisition of Western Healthcare, as revenue in Medical Manager's reported earnings for the year ending December 31, 1999.

98.    On or about March 31, 2000, defendant **ROBBINS** and others caused Medical Manager to recognize an additional $2,055 from "deferred revenue," previously recorded in connection with the acquisition of Western Healthcare, as revenue in Medical Manager's reported earnings for the quarter ending March 31, 2000.

### *Blue Cross Blue Shield of Georgia Round Trip Sale*

99.    On or about June 30, 1999, defendant **ROBBINS** and others caused Medical Manager to increase the amount it paid to acquire Blue Cross Blue Shield of Georgia (BCBS of Georgia) by approximately $1,500,000.

100.    On or about June 30, 1999, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" 300 software licenses to BCBS of Georgia for $1,500,000.

101.    On or about June 30, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $1,500,000 it received back from BCBS of Georgia as revenue in Medical Manager's reported earnings for the quarter ending June 30, 1999.

19

### *CSC Healthcare, Inc. Round Trip Sale*

102.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager to increase the amount it paid to acquire the PM2000 division of CSC Healthcare, Inc. (CSC)  by approximately $1,234,800.

103.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" 196 software licenses to CSC for $1,234,800.

104.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $1,234,800 it received back from CSC as revenue in Medical Manager's  reported earnings for the quarter ending March 31, 1999.

### *Quantum Healthcare Systems, Inc. "Deferred Revenue"*

105.    In or about March of 1999, defendant **ROBBINS** and others caused Medical Manager to reclassify $248,308 in previously recognized income on the books of Quantum Healthcare Systems, Inc. (Quantum) as  "deferred revenue" when it was put on the books of Medical Manager.

106.    On or about June 30, 1999,  defendant  **ROBBINS** and others caused Medical Manager  to recognize $204,629  from "deferred revenue," previously recorded in connection with the acquisition of Quantum, as revenue in Medical Manager's reported earnings for the quarter ending June 30, 1999.

107.    On or about September 30, 1999,  defendant **ROBBINS** and others caused Medical Manager  to recognize an additional $24,958 from "deferred revenue," previously recorded in connection with the acquisition of Quantum, as revenue in Medical Manager's reported earnings for the quarter ending  September 30, 1999.

20

108.    On or about March 31, 2000, defendant **ROBBINS** and others caused Medical Manager to recognize an additional $18,721 from "deferred revenue," previously recorded in connection with the acquisition of Quantum, as revenue in Medical Manager's reported earnings for the quarter ending March 31, 2000.

### *HealthPro Solutions, Inc. "Pooling of Interest"*

109.    On or about March 24, 2000, defendant **ROBBINS** and others caused Medical Manager to acquire HealthPro Solutions, Inc. (HealthPro) in exchange for $12,550,000 worth of Medical Manager stock.

110.    On or about March 31, 2000, defendant **ROBBINS** and others caused Medical Manager to account for the acquisition under the "pooling of interest" method of accounting. which required that there be no change in the equity ownership of HealthPro in contemplation of the acquisition during the preceding two years.

111.    In or about March of 2000, defendant **ROBBINS** and others knew that there had in fact been a change in equity ownership of HealthPro in contemplation of the acquisition within the preceding two years.

112.    On or about March 31, 2000, defendant **ROBBINS** and others caused Medical Manager, under the "pooling of interest" method of accounting, to recognize all of the revenue previously recognized by HealthPro in the quarter of acquisition, as revenue in Medical Manager's reported earnings for the quarter ending March 31, 2000.

### *HealthPro, Inc. "Deferred Revenue"*

113.    In or about March of 2000, defendant **ROBBINS** and others caused Medical Manager to reclassify approximately $798,600 in previously recognized income on the books of

21

HealthPro as "deferred revenue" when it was put on the books of Medical Manager.

114.    In or about April of 2000, defendant **ROBBINS** and others caused Medical Manager to recognize $798,600 from "deferred revenue," previously recorded in connection with the acquisition of HealthPro, as revenue in Medical Manager's reported earnings for the quarter ending March 31, 2000.

### *HealthPro, Inc. "Accrued Liabilities"*

115.    On or about March 31, 2000, defendant **ROBBINS** and others caused Medical Manager to unjustifiably inflate accrued liabilities, "payroll expense," on the books of HealthPro by $358,000 when it was put on the books of Medical Manager.

116.    On or about April 28, 2000, defendant **ROBBINS** and others caused Medical Manager to unjustifiably decrease accrued liabilities, "payroll expense," relating to the acquisition of HeathPro by $187,000, thereby decreasing operating expenses and increasing Medical Manager's reported earnings for the quarter ending June 30, 2000.

### *Benchmark Systems, Inc. "Deferred Revenue"*

117.    In or about September of 2000, co- conspirators caused Medical Manager to reclassify approximately $197,438 in previously recognized income on the books of Benchmark Systems, Inc. (Benchmark) as "deferred revenue" when it was put on the books of Medical Manager.

118.    In or about November of 2000, co-conspirators caused Medical Manager to reclassify $22,297 in previously recognized income on the books of Benchmark as "deferred revenue" when it was put on the books of Medical Manager.

119.    In or about December of 2000, co-conspirators caused Medical Manager to recognize $219,734, from "deferred revenue," previously recorded in connection with the acquisition of Benchmark, as revenue in Medical Manager's reported earnings for the quarter ending December 31, 2000.

### Fraudulent Recognition of Sales Revenue

#### "Sales" to Medical Computer Systems, Inc.

##### First "Sale"

120.    On or about February 18, 1999, defendant **ROBBINS** and others caused Medical Manager to inflate the purchase price it paid Medical Computer Systems, Inc.(Medical Computer Systems) for a customer list by $235,000.

121.    On or about February 18, 1999, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell"  custom programming to Medical Computer Systems for $235,000.

122.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $235,000 it received back from Medical Computer Systems as revenue in the quarter ending March 31, 1999.

##### Second "Sale"

123.    In the first quarter of 1999, defendant **ROBBINS** called three co-conspirators who were together in the lobby of a Hilton Hotel in New Jersey.  Defendant **ROBBINS** advised the three co-conspirators that Medical Manager would fall short of its expected earnings for the quarter.  Defendant **ROBBINS** and the three co-conspirators agreed to enter into an additional "round trip" sale of software for $175,000 with Medical Computer Systems.

23

124.    On or about March 22, 1999, defendant **ROBBINS** and others caused Medical Manager to agree to increase the purchase price it paid Medical Computer Systems for a "Marketing and Conversion Agreement" by $175,000.

125.    On or about March 22, 1999, defendant **ROBBINS** and others caused Medical Manager  simultaneously to "sell" to Medical Computer Systems certain software licenses for $175,000.

126.    On or about March 31, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $175,000 it received back from Medical Computer Systems as revenue in the quarter ending March 31, 1999.

*Third "Sale"*

127.    On or about June 23, 1999, defendant **ROBBINS** and others caused Medical Manager to agree to increase the purchase price it paid Medical Computer Systems for an "Amendment to the Marketing and Conversion Agreement" by $1,200,000.

128.    On or about June 23, 1999, defendant **ROBBINS** and others caused Medical Manager simultaneously to "sell" to Medical Computer Systems 250 software licenses for $1,200,000.

129.    On or about June 23, 1999, defendant **ROBBINS** and others caused Medical Manager to recognize the $1,200,000 it received back from Medical Computer Systems as revenue in the quarter ending June 30, 1999.

***"Sale" to New Bedford Medical Group***

130.    On or about September 30, 1998, defendant **ROBBINS** and others caused Medical Manager to record approximately $200,000 in revenue relating to the sale of Medical

24

Manager software and training to the New Bedford Medical Group, when they knew the sale did not qualify for the recognition of revenue.

### *"Sale" to BBB Health Resources*

131.    On or about December 31, 1999, defendant **ROBBINS** and others caused Medical Manager to record approximately $259,000 in revenue relating to the sale of Medical Manager software and hardware to BBB Health Resources, when they knew the sale did not qualify for the recognition of revenue.

### *"Sale" to Huntington Internal Medicine Group*

132.    On or about December 31, 2000, defendant **ROBBINS** and others caused Medical Manager to record approximately $1,200,000 in revenue relating to the sale of Medical Manager software and hardware to the Huntington Internal Medicine Group, when they knew the sale did not qualify for the recognition of revenue.

### *"Sale" to Compass Medical*

133.    On or about June 30, 2000, defendant **ROBBINS** and others caused Medical Manager to record approximately $140,000 in revenue relating to the sale of Medical Manager software and hardware to Compass Medical, when they knew the sale did not qualify for the recognition of revenue.

### *"Sale" to Staten Island Medical Group*

134.    On or about June 30, 2000, defendant **ROBBINS** and others caused Medical Manager to record approximately $590,000 in revenue relating to the sale of Medical Manager software and hardware to the Staten Island Medical Group, when they knew the sale did not

qualify for the recognition of revenue.

### *"Sale" to Metropolitan State College of Denver*

135.    On or about the June 30, 2001, co-conspirators caused Medical Manager to record approximately $306,000 in revenue relating to the sale of Medical Manager software and hardware to the Metropolitan State College of Denver when they knew the system did not qualify for the recognition of revenue.

### *Improper Recognition of Training Revenue*

136.    In or about July of 2001, a co-conspirator instructed two other co-conspirators to fraudulently recognize $350,000 of unearned training hours on the books of MMNE as a result of the acquisition of HealthPro.

137.    In or about 2001, a co-conspirator advised a second co-conspirator that another co-conspirator was utilizing unused training hours to make his regional financial goals.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Conspiracy to Launder Monetary Instruments, 18 U.S.C. § 1956(h))

**THE GRAND JURY ALSO CHARGES:**

1.     Paragraphs 1 through 12 of this Indictment are realleged and incorporated herein.

2.     From in or about 1996, and continuing until at least the date of the Indictment, in the District of South Carolina and elsewhere, defendants **LEE A. ROBBINS (ROBBINS)** and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other, to knowingly engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity (namely, a scheme and artifice to defraud as described in paragraphs 13 through 44 of Count 1 of this Indictment), in violation of 18 U.S.C. § 1957.

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy to enrich defendant **ROBBINS** and his co-conspirators through such monetary transactions by transferring to themselves and others proceeds from the conspiracy alleged in paragraphs 13 through 44 of Count One of this Indictment.

27

### Manner and Means

4.    It was part of the manner and means of the conspiracy that defendants **ROBBINS**
and his co-conspirators through the manner and means set forth in paragraphs 15 through 44 of
Count 1 of this Indictment would cause Medical Manager to issue materially false financial
statements.

5.    It was further part of the manner and means that certain co-conspirators and
others would receive Medical Manager stock in connection with the merger of their companies
with Medical Manager.

6.    It was further part of the manner and means of the conspiracy, that defendant
**ROBBINS** and others received Medical Manager stock and stock options as a reward for their
past participation in the conspiracy alleged in Count 1 of this Indictment, and as an incentive for
their continued participation in that conspiracy.

7.    It was further part of the manner and means of the conspiracy that defendant
**ROBBINS** and others caused Medical Manager to issue stock to the public in the 1998
"Secondary Offering" at a fraudulently inflated price.

### OVERT ACTS

8.    In furtherance of the conspiracy and to achieve the objects and purposes thereof,
defendant **ROBBINS** and others committed and caused to be committed the following overt acts,
among others in the District of South Carolina and elsewhere:

9.    Between 1997 and 2000, defendant **ROBBINS** and others were granted Medical
Manager stock options pursuant to one or more of the following plans: 1996 Long Term
Incentive Plan, 1996 Amended and Restated Long Term Incentive Plan and the 1999 Medical

28

Manager Corporation Stock Option Plan for Employees of Medical Manager Health Systems, Inc.

10.    On or about the dates set forth below, defendant **ROBBINS** sold Medical Manager stock or stock of Medical Manager's parent, WebMD for the amount indicated:

| Defendant | Date | Shares | Proceeds |
|---|---|---|---|
| **Lee Robbins** | 02/24/00 | 3,125 | $   291,961 |
| **Lee Robbins** | 02/29/00 | 1,000 | $     93,668 |

11.    On or about the dates set forth below, defendant **ROBBINS** and others knowingly engaged in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is, the transfer of funds by wire and monetary instrument as listed below, in the amounts listed below, such property having been derived from specified unlawful activity, that is, the scheme and artifice to defraud as set forth in paragraphs 13 through 44 of Count 1 of this Indictment,  in violation of 18 U.S.C. §§ 1341 and 1343:

| Defendant/<br>co-conspirator | Date | Amount | Transaction |
|---|---|---|---|
| Co-conspirator #1 | 12/30/98 | $ 50,703 | check # 1058 to Deluca Toyota drawn on Merrill Lynch Account # 718-44751 in Greenville, S.C. |
| Co-conspirator #1 | 04/16/99 | $100,000 | check # 1185 to E-Trade Securities drawn on Merrill Lynch Account # 718-44751 in Greenville, S.C. |

| Co-conspirator #1 | 02/03/03 | $ 51,516 | check # 2808 to Steadfast Marine drawn on Merrill Lynch Account # 569-22134 in Hilton Head, S.C. |
| **ROBBINS** | 02/29/00 | $291,871 | wire transfer from Donaldson, Lufkin and Jenrette Account #213-303316 To First Union Bank, N.B. Account #1090011225676 |
| **ROBBINS** | 02/29/00 | $ 49,455 | Wire Transfer from Wachovia Securities Account #527-09994 to First Union Account #1090011225676 |

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

**1.     CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD:**

  A. As a result of the foregoing violations of Title 18, United States Code, Section 371 (conspiracy) as charged in Count 1 of this Indictment, upon conviction, the Defendant **ROBBINS** shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds the Defendant obtained, directly or indirectly, as the result of such violations, and any property traceable to such property;

  B. Pursuant to 18 U.S.C. § 982(a)(2)(A), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) the property which is subject to forfeiture upon conviction of the Defendant for the violation charged in Count 1 of this Indictment includes, but is not limited to, the following:

    Money Judgment/Cash:

    A minimum of approximately $53,000,000 in United States currency, and all interest and proceeds traceable thereto, in that such sum in the aggregate constitutes proceeds the Defendants obtained, directly or indirectly, as the result of such violations of 18 U.S.C. § 371.

**2.     MONEY LAUNDERING:**

  A. As a result of the foregoing violations of Title 18, United States Code, Section 1956(h), (money laundering conspiracy) as charged in Count 2 of this Indictment, upon conviction, the Defendant **ROBBINS** shall forfeit to the United States any property, real or personal, which was involved in such offense, and any property traceable to such property;

B.    Pursuant to 18 U.S.C. § 982(a)(1), the property which is subject to forfeiture upon conviction of the Defendant **ROBBINS** for the violations charged in Count 2 of this Indictment includes, but is not limited to, the following:

Cash:

A minimum of approximately $53,000,000 in United States currency, and all interest and proceeds traceable thereto, in that such sum in the aggregate constitutes property which was involved in such violations of 18 U.S.C. § 1956(h), as charged in Count 2 of this Indictment.

3.    **SUBSTITUTE ASSETS:**

A.    If any of the property described above as being subject to forfeiture to the United States, as a result of any act or omission of the Defendant **ROBBINS**:

1.    Cannot be located upon the exercise of due diligence;
2.    Has been transferred or sold to, or deposited with a third party;
3.    Has been placed beyond the jurisdiction of the Court;
4.    Has been substantially diminished in value; or
5.    Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Sections 982(b)(1), [incorporating Title 21, United States Code, Section 853(p)], to seek forfeiture of any other property of the said Defendant(s) up to the value of the above forfeitable property;

Pursuant to Title 18, United States Code, Section 982.

32

A __TRUE__ BILL


*S/ Foreman*
FOREMAN


*S/ Jonathan S. Gasser*
JONATHAN S. GASSER (mgb)
UNITED STATES ATTORNEY

# PENALTIES

## COUNT 1

### MAXIMUM SENTENCE THIS COUNT
FINE OF $ 250,000    (18 USC §3571)
AND/OR IMPRISONMENT FOR  5  YEAR(S)
AND A TERM OF SUPERVISED RELEASE OF
 3  YEAR(S) (18 USC §3583)
SPECIAL ASSESSMENT $ 100.00
(18 USC §3013)

## COUNT 2

### MAXIMUM SENTENCE THIS COUNT
FINE OF $ 250,000    (18 USC §3571)
AND/OR IMPRISONMENT FOR  10  YEAR(S)
AND A TERM OF SUPERVISED RELEASE OF
 3  YEAR(S) (18 USC §3583)
SPECIAL ASSESSMENT $ 100.00
(18 USC §3013)